GLADNEY, Judge.
This suit was brought by W. A. Sprowl July 9, 1953, against J. M. Foshee for the return of $310 paid by plaintiff to defendant as the purchase price of a 1940 Chevrolet one and one-half ton truck. The action is grounded upon the alleged failure of the vendor to furnish a satisfactory certificate of title. During the trial of the case plaintiff admitted a title certificate had been tendered to him, which certificate was issued by the Department of Revenue, Motor Vehicle Division of the State of Louisiana, *639 on October 5, 1951. From a judgment rejecting plaintiff’s demands, he has appealed.
The alleged cause of action is substantially embraced in the following articles of plaintiff’s petition:
“Petitioner has attempted to secure a title to this vehicle but has been informed by the Department of Revenue, State of Louisiana, that the motor card covering the registration on this truck says that this motor number has been duplicated and that a physical inspection must be made by the State Police to correct the title. That after this notification, which came to your petitioner on May 14, 1953, petitioner made an examination of the motor on this vehicle and found that the serial number on said motor had been ground off and a new set of numbers had been placed on this vehicle.
“That your petitioner has never been able to secure a title to this property, nor has he been able to get a certificate of title because of the defective number thereon. That he has repeatedly requested defendant to have this condition corrected without avail. That he has been unable to drive this vehicle because of the fact that he cannot get a license for it because of this fact.
“That our petitioner did not have a good title to this property and that defendant has never completed delivery of this vehicle by virtue of the fact that said defendant has been unable to deliver to petitioner good title. That your petitioner is entitled to the return of the money which he has paid Mr. Foshee, together with judicial interest from date of demand until paid, together with all costs of this suit.”
The above allegations were denied by the defendant who averred a title certificate to said automobile with proper assignment was tendered to plaintiff but refused. Defendant averred further that plaintiff has had the use of the truck since the date of the sale.
The evidence indicates plaintiff, who elected to try his lawsuit without an attorney, became suspicious of the title to the vehicle, about six months after the purchase from Foshee. Apparently, this was induced by the delay of defendant in surrendering the certificate of title and from a discovery that the original motor number of the vehicle had been removed and the number appearing thereon, No. 1105142, was identical with the number of another motor.
On May 7, 1953, plaintiff wrote the State Motor Vehicle Division and requested information as to whether there were two or more certificates of title with the above motor number. The reply to this letter from the Chief of the Motor Vehicle Division stated:
“Our files show that Title No. 680956 was issued to J. M. Foshee, 1706 Texas Street, Natchitoches. However, the motor card covering that registration bears this notation:
“ ‘This motor number has been duplicated. Before issuing another title on this vehicle have a physical inspection made by State Police and correct title.’
"You zvill be safe in purchasing this vehicle, but before making application you must comply with the notation quoted above/' (Emphasis supplied.)
About the time he received the foregoing letter plaintiff was tendered the certificate of title by Foshee, yet notwithstanding the suggestion made in the letter from the Motor Vehicle Division, plaintiff admits he made no effort to have the proper inspection made. Sprowl’s position is clearly set forth in the following testimony:
“Mr. Sprowl: The first time that I ever saw it (the certificate of title) Mr. Foshee walked out of the back door of his house with it. That was the first time that I ever saw it. And by then I had done got suspicious and I had wrote * * *
“The Court: We are not interested in how you felt. We are trying to find out what happened.
*640 “Mr. Sprowl: Alright, then after we received this first letter from the Revenue Department I went * * *
“The Court: Was that before or aiter you went up tp the Valley Finance Company ?
“Mr. Sprowl: That was — that was along about the same time because when I found out there was something wrong with it, well, I demanded the title from Mr. Foshee. Well, after I demanded it from him I told him that I had to have the title * * *
“The Court: And after he offered it to you, you didn’t want it because you were suspicious?
“Mr. Sprowl: Yes, sir.
“The Court: Well, that’s all right, there’s no use rehashing it, we’ve been through all of that.
“Mr. Sprowl: The last time that I went to see him was about May of 1953. After I demanded it of him kind of strongly he went in the back door of his house and come out with two shoe boxes full of old titles and he reached in one of those shoe boxes and brought out this title and he handed it to me. Now that was at the back door of his house. Well, I looked at it — he signed it then and he give it to me and I turned it over and looked at it on the back and it hadn’t been notarized and I said: Well, it hadn’t been notarized’ and he said: Well, meet me down at Valley Finance Company and we’ll get it notarized down there.’ So about thirty minutes later or an hour later I met him down there and then this other conversation took place.
“The Court: And it ended up that you wouldn’t take the title ?
“Mr. Sprowl: That’s right.
“The Court: You don’t know but what they could have gotten you title if you had accepted it?
“Mr. Sprowl: Oh, they might have but it still — the engine numbers would ■still be messed up. There is two vehicles with the same engine numbers and there’s this truck with the marks of a grinding wheel on it and I didn’t want to accept the responsibility.”
The Vehicle Certificate Title Law, LSA-R.S. 32:706 et seq. as amended by Act 228 of 1954, provides, subject to the exceptions mentioned in Sections 705 and 712 of the Act that “no person buying a vehicle from the owner thereof, whether such owner be a dealer or otherwise, hereafter shall acquire a marketable title in or to said vehicle until the purchaser shall have obtained a certificate of title to said vehicle * * * It was held in General Motors Acceptance Corporation v. Daigle, 1954, 225 La. 123, 72 So.2d 319, that a buyer’s title to an automobile was not merchantable or marketable until the purchaser received a certificate of title. This, of course, does not mean that the actual possession of the certificate of title need be in the hands of the purchaser. The holder thereof may possess in trust, or for future delivery, for the one having actual title to the automobile. Thus, in Hamner v. Domingue, La.App.1955, 82 So.2d 105, 107, the court stated:
“LSA-R.S. 32:706, quoted in part above, does not provide that no valid title shall be perfected until the purchaser obtains a title certificate, but that no marketable title shall be perfected until that time. The term ‘marketable title’ does not connote that the vendor cannot sell, but that he cannot enforce an agreement to buy, in absence of same, Words & Phrases (Perm.Edition), Volume 26A, pp. 35-55, Verbo ‘Marketable Title’. Thus third-opponent Hernandez could not have enforced the agreement of another to purchase his car until he had received his certificate of title on September 2, 1953. But on receiving said certificate, Hernandez not only had a good and valid title, but also a ‘marketable’ title to said car.”
Despite his objections and suspicions plaintiff was tendered a title which the Motor Vehicle Division declared valid.
*641 Nor can we ignore the' failure of plaintiff to return defendant the vehicle in question. Surely, he should not have retained and used the truck and also obtained return of the full sum paid for it. It was incumbent upon plaintiff at or before demanding the return of the purchase price to deliver the truck back into the hands of defendant, or at least he must have made á bona fide attempt to do so.
Our careful examination of the record has not brought to our attention manifest error in the ruling complained of and we must affirm the judgment. We may add that the record convincingly shows the trial-judge conscientiously sought within the bounds of propriety to render all possible assistance in the presentation of the evidence by plaintiff, who was not aided by attorney, to the end that a just decision could be reached.
For the reasons assigned, the judgment from which appealed is affirmed at appellant’s cost.