358 So.2d 826 (1978)
James David RAULERSON, Appellant,
v.
STATE of Florida, Appellee.
No. 47991.
Supreme Court of Florida.
March 16, 1978.
Rehearing Denied June 5, 1978.
*828 David J. Busch, Asst. Public Defender, Tallahassee, for appellant.
Robert L. Shevin, Atty. Gen., and Andrew W. Lindsey and Charles W. Musgrove, Asst. Attys. Gen., Tallahassee, for appellee.
ADKINS, Justice.
This is a direct appeal from a judgment adjudging defendant guilty of murder in the first degree and a sentence of death.
The defendant, Raulerson, at approximately 11:00 o'clock p.m., Sunday night, April 27, 1975, walked to the back door of the Sailmaker restaurant in Jacksonville, Florida, where he pointed a.38 caliber revolver at Leonard J. Wilson, a young man working at the restaurant. Raulerson then pulled a wool mask over his head, forcing Wilson to enter the restaurant and lie face down on the floor. Raulerson went to the manager's office where the manager, Robert E. Couture, was sitting with his wife, Nancy Couture, "cashing out receipts" for the restaurant. He forced them to lie on the floor with their face down and then was heard scooping the restaurant's money off the table. Raulerson, after cutting the telephone wire, went to the back of the restaurant where everyone present was forced to lie down with their face to the floor.
Raulerson then took a young secondary school art teacher who was working evenings at the restaurant, to a back room with him. He forced her to take off her clothes and place her mouth on his penis. He then inserted his penis in her vagina, later pulling his penis out of her vagina and ejaculating on her stomach.
In the meantime, Raulerson's cousin, Jerry Leon Tant, wearing a mask similar to the one worn by Raulerson, was standing guard over the others in the restaurant. Officer English, answering a call, came to the scene and started pushing a buzzer at the door of the restaurant. When there was no response to the buzzer, Officer English opened the door, saw Tant standing at the door with the mask on and an automatic pistol in his hand. He shot Tant with Tant falling to the floor. Officer English then bent over Tant.
Raulerson at this time left the young art teacher, went out into the main part of the restaurant, saw Officer English bending over Tant, and shot Officer English in the chest after which Officer English cried out that he was hurt. Officer Stewart, who was standing behind Officer English, started shooting Tant who was moving. Raulerson fired five more shots from his revolver, emptying the revolver and shooting Officer Stewart in the heart, killing him. During this period there were approximately fifteen shots fired. Raulerson then ran from the immediate scene of the shooting clutching his side where he had been shot, trying to escape. After finding no viable escape route, Raulerson returned, took off his mask, laid down his gun, and surrendered.
An indictment was returned charging defendant with murder in the first degree. He was convicted and the sentence of death was imposed. This appeal resulted.
Defendant attacks the Florida death penalty, contending that it violates the provisions of the Fifth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 9 and 17, Florida Constitution, because arbitrary, standardless discretion still exists in the process by which the penalty is determined and imposed. He also says that the death penalty is inherently unconstitutional in that it is cruel and unusual punishment.
Among other things, the defendant says that the state attorney is granted unbridled discretion in that he has a choice in filing capital charges against one co-defendant and not against another equally culpable co-defendant; that he can seek conviction for any lesser degree of a capital offense or for a lesser offense; and that he has discretion in plea negotiations.
In considering the question of discretion in the sentencing procedure, this Court in State v. Dixon, 283 So.2d 1 (Fla. 1973), discussed Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and said:

*829 "The mere presence of discretion in the sentencing procedure cannot render the procedure violative of Furman v. Georgia, supra; it was, rather, the quality of discretion and the manner in which it was applied that dictated the rule of law which constitutes Furman v. Georgia, supra.

"Discretion and judgment are essential to the judicial process, and are present at all stages of its progression  arrest, arraignment, trial, verdict, and onward through final appeal. Even after the final appeal is laid to rest, complete discretion remains in the executive branch of government to honor or reject a plea for clemency. See Fla. Const., art. IV, § 8, F.S.A., and U.S.Const., art. II, § 2.
"Thus, if the judicial discretion possible and necessary under Fla. Stat. § 921.141, F.S.A., can be shown to be reasonable and controlled, rather than capricious and discriminatory, the test of Furman v. Georgia, supra, has been met. What new test the Supreme Court of the United States might develop at a later date, it is not for this Court to suggest.
* * * * * *
"Capital punishment is not, per se, violative of the Constitution of the United States (Furman v. Georgia, supra) or of Florida. Wilson v. State, 225 So.2d 321 (Fla. 1969)." pp. 6-7.
This reasoning and holding was followed and affirmed in Sullivan v. State, 303 So.2d 632 (Fla. 1974). These cases are dispositive of the issues raised on this point.
Defendant then contends that the State failed to prove that Michael David Stewart was dead in that the proof failed to show that the Michael David Stewart named as the deceased in the indictment was the victim. He cites Freeman v. State, 101 So.2d 887-88 (Fla.2d DCA 1958), where the court held that proof of identity was an essential element of the corpus delicti. Defendant also refers to Smith v. State, 80 Fla. 710, 86 So.2d 640 (1920), where the information alleged that the victim's name was "Mary Ida Bogich," but the proof only shows that a "little girl" was killed. This was held insufficient.
The proof of the identity of the deceased must be established beyond a reasonable doubt. If circumstantial evidence is resorted to, the proof must be the most convincing, satisfactory, unequivocal proof that is compatible of the nature of the case. Johnson v. State, 201 So.2d 492 (Fla.4th DCA 1967).
The court in Trowell v. State, 288 So.2d 506 (Fla.1st DCA 1973), set out nine methods that could be utilized in proving this element of the corpus delicti.
"It would have been manifestly easy for the State in its zeal to prove beyond a reasonable doubt that Raymond Jones was dead and to identify his dead body:
"1. There could have been the testimony of a relative or friend who saw his dead body as late as the funeral service;
"2. The funeral director, if he knew him personally;
"3. Any person who saw his corpse at the hospital who knew him personally;
"4. A photograph could have been taken of the cadaver which was autopsied which could later at trial have been identified by any person who knew him in his lifetime;
"5. A picture properly identified as Raymond Jones when alive could have been identified at trial as the person upon whom Doctor Klein performed the autopsy;
"6. Since allegedly death occurred sometime after the incident at the Santa Fe Bar, a certified copy of the death certificate could have been proffered;
"7. Circumstantial evidence, such as the contents of the body's billfold, rings and other personal effects, garments, etc., could have been utilized.
"8. Scientific evidence, such as fingerprints, identification of teeth, hair, etc., tending to establish identity, may have been available to the State; and finally
"9. The prosecution could have at least proffered the hospital records where presumably Raymond Jones died, as well as the bullet which caused the death of *830 the person whose body was somehow delivered to the autopsy room of the Alachua General Hospital on July 3, 1972." At 508.
In the case sub judice, Officer James E. English testified that he went to the Sailmaker Restaurant with his "partner, Officer Mike Stewart," and that Mike Stewart was shot. He identified the individual in a photograph as being Mike Stewart. The pathologist performed an autopsy on the body of the person identified in the photograph as Officer Stewart. Officer Weathington saw "Officer Stewart" fall when he was hit by gunfire and he pulled "Officer Stewart" out of the line of fire. He checked "Officer Stewart's" pulse and stated "Officer Stewart has no pulse, and in my estimation, he was dead at the time." This evidence is sufficient to prove the fact that the victim died. See Sims v. State, 184 So.2d 217 (Fla.2d DCA 1966).
Defendant says there was a fatal variance in that the information charged that defendant murdered "Michael David Stewart" and the proof showed that "Mike Stewart" was the name of the deceased. Defendant relies upon Davis v. People, 19 Ill. 74 (1857), and Timms v. State, 44 Tenn. (4 Cold.) 138 (1867).
In Davis v. People, supra, defendant was charged with the murder of "Seth Taylor," but the victim was identified by the witnesses as "Taylor." This warranted a reversal.
Timms v. State, supra, charged defendant with the murder of "H.G. Trobeck," but the victim was referred to during testimony as "Gilbert Trobeck" or "the deceased Trobeck." The Tennessee Supreme Court held that in the absence of any proof that the victim was known as H.G. Trobeck, the variance was fatal and a new trial was ordered.
In Branch v. State, 94 Fla. 286, 115 So. 143 (1928), defendant was charged with assault with intent to commit murder upon one "Harry C. Beaty." The testimony showed that the true name of the victim was "Henry Beaty." While there was no testimony that the victim was as well known by the name of "Harry" as by the name of "Henry," or that he was generally or commonly known as "Harry," there was testimony that his true name was "Henry" and that he had been called "Harry" by his associates and others. The Court held that the testimony established the identity of the person alleged and proved to have been assaulted.
A material variance between the name alleged, and that proved, is fatal. Primarily, it is a question of identity and the essential thing in the requirement of correspondence between the allegation of the name in the indictment and the proof is that the record must be such as to inform the defendant of the charge against him and to protect him against another prosecution for the same offense.
It is general knowledge, and we take judicial notice of the fact that a person named "Michael" is generally referred to as "Mike." We hold that the proof of the identity of the deceased was established beyond a reasonable doubt. The defendant could not have been embarrassed in the preparation of his defense, and the identity of the victim as alleged in the indictment with the person who was shot by the defendant is clearly shown by the record. This protects the accused against another prosecution for the same offense.
The evidence is sufficient to sustain the verdict of guilty of murder in the first degree.
After the rendition of the verdict a penalty hearing was held. The State produced witnesses who testified that defendant and his accomplice had committed an identical type of robbery in Hokes Bluff, Alabama, an act which defendant admitted in his own testimony during the penalty phase. A psychiatrist produced by defendant testified that defendant had a deepseated character disorder and that he was given to impulsive "acting-out" when under the influence of alcohol or drugs. The defendant himself testified that he had not been using drugs or alcohol at the time of the incident. The *831 jury recommended the death sentence. At the conclusion of the penalty phase, the following occurred:
"THE COURT: At this time, the jury having found James David Raulerson to be guilty of Murder in the First Degree, the jury having rendered its Advisory Sentence  eight recommending the death penalty and four recommending life in prison  the Court having found, pursuant to the jury verdict, the defendant guilty of the crime of Murder in the First Degree, and the Court having denied the Motion for New Trial and other Motions of the defendant, the Court does at this time adjudicate the defendant, James David Raulerson, to be guilty of the crime of Murder in the First Degree, Case No. 75-1325.
"Do you, or anyone on your behalf, have any legal cause to show why sentence should not be pronounced?
"MR. STEDEFORD: No legal cause at this time, Your Honor.
"THE COURT: Is there anything further in mitigation or aggravation?
"MR. STEDEFORD: Your Honor, I talked with Mr. Raulerson about the matter earlier. Anything he might say, we realize, of course, that you have the Presentence Investigation Report that you have provided to me. I have gone over it, I know that you have.
"THE COURT: Mr. Stedeford, I requested my secretary to give you two copies of that so Mr. Raulerson may have one also.
"MR. STEDEFORD: I have not given him his copy. I received a second copy earlier just a few moments ago, but I will give him one at the conclusion of this hearing.
"Your Honor, Mr. Raulerson and I did discuss what mitigation we might bring before the Court. We, frankly, feel as though it would do little good to talk of mitigation in this case, and we feel as though you have considered it, and that Mr. Raulerson and I both concur that anything we might say would not change what you might be doing today.
"At this time, Your Honor, there's nothing further to say in mitigation."
Defendant now says there was a violation of the principles announced in Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), in that the defendant himself was not shown the presentence investigation report.
The record clearly shows that defense counsel was provided with a copy of the presentence report and that he discussed the matter of mitigation with the defendant prior to the time the judge imposed the sentence. The presentence report was made a part of the record and defendant has not referred to any portion which he desires to rebut or explain.
Gardner contemplates that the presentence report be furnished to defense counsel, as stated by the court:
"There is no dispute about the fact that the presentence investigation report contained a confidential portion which was not disclosed to defense counsel. At 1202.
* * * * * *
"Without full disclosure of the basis for the death sentence, the Florida capital sentencing procedure would be subject to the defects which resulted in the holding of unconstitutionality in Furman v. Georgia. In this particular case, the only explanation for the lack of disclosure is the failure of defense counsel to request access to the full report. That failure cannot justify the submission of a less complete record to the reviewing court than the record on which the trial judge based his decision to sentence petitioner to death.
"Nor do we regard this omission by counsel as an effective waiver of the constitutional error in the record. There are five reasons for this conclusion. First, the State does not urge that the objection has been waived. Second, the Florida Supreme Court has held that it has a duty to consider `the total record,' Swan v. State, 322 So.2d 485, 489 (1975), when it reviews a death sentence. Third, since two members of that court expressly considered *832 this point on the appeal in this case, we presume that the entire court passed on the question. Cf. Boykin v. Alabama, 395 U.S. 238, 240-242, 89 S.Ct. 1709, 1710-1712, 23 L.Ed.2d 274 and n. 3. Fourth, there is no basis for presuming that the defendant himself made a knowing and intelligent waiver, or that counsel could possibly have made a tactical decision not to examine the full report, cf. Estelle v. Williams, 425 U.S. 501, 507-508, 96 S.Ct. 1691, 1694-1695, 48 L.Ed.2d 126. Fifth, since the judge found, in disagreement with the jury, that the evidence did not establish any mitigating circumstance, and since the presentence report was the only item considered by the judge but not by the jury, the full review of the factual basis for the judge's rejection of the advisory verdict is plainly required. For if the jury, rather than the judge, correctly assessed the petitioner's veracity, the death sentence rests on an erroneous factual predicate." (Emphasis supplied.) 97 S.Ct. at 1206-07.
The record clearly shows that the trial court complied with the Gardner standards.
Thereupon, the defendant was sentenced to death. The following findings in mitigation and aggravation were made by the court:
"MITIGATION
"(a) Whether the defendant has no significant history of prior criminal activity.
"Finding:
As a juvenile, or a young adult, Raulerson received at least one sentence to the State Institution at Alto, Georgia for larceny in the State of Georgia, occurring in 1967. On March 12, 1975, Raulerson robbed the Warehouse Grocery, Hokes Bluff, Alabama. In committing the robbery, he followed the same procedure that he followed in the present case in that he used a .38 caliber revolver, a similar mask, and required everyone to lie on the floor, face down. Raulerson was positively identified by James Pritchett, the husband of the head cashier of the Warehouse Grocery, as the man who pointed a .38 caliber revolver at him on the night of the robbery. After the Jacksonville Sheriff's Office arrested Raulerson, they found approximately $11,000.00 in his Corvette automobile parked at the Ramada Inn at Jacksonville Beach. The money has been traced to the money taken in a robbery on March 12, 1975, of the Warehouse Grocery, Hokes Bluff, Alabama, and the money taken from a robbery committed on April 26, 1975, at the Brown Derby Restaurant, Tallahassee, Florida. The State of Alabama has extradition proceedings in progress to return Raulerson to Alabama to be tried for armed robbery.
"(b) Whether the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
"Finding:
Raulerson knew and was able to understand the nature, quality, and wrongfulness of his acts on April 27, 1975; was able to understand the charges facing him; was able to adequately assist counsel in his defense at the trial. Raulerson has an antisocial or passive/aggressive personality with a dichotomy in personality (a Jekyll-Hyde personality with the catalyst which triggers the Mr. Hyde manifestation being alcohol, drugs, or a verbally or physically perceived threat). Raulerson denies using drugs or alcohol in excess. There was no evidence of extreme mental or emotional disturbance during the commission of the crime.
"(c) Whether the victims were participants in the defendant's conduct or consented to the act(s).
"Finding:
The victims at no time and in no way consented nor participated in the conduct of the defendant's acts.
"(d) Whether the defendant was an accomplice in the murder committed by another person, and the defendant's participation was relatively minor.
"Finding:

*833 Raulerson was not a mere accomplice but was the active and aggressive perpetrator of the robbery, the rape, and the murder.
"(e) Whether the defendant acted under extreme duress or under the substantial domination of another person.
"Finding:
The defendant was the dominant person in the robbery, rape, and murder and in all surrounding events. There was absolutely no evidence of any form of duress or domination.
"(f) Whether the capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired.
"Finding:
Raulerson fully appreciated the criminality of his conduct and was capable of conforming his conduct to the requirements of law [refer to mitigation finding (b)].
"(g) The age of the defendant at the time of the crime.
"Finding:
Raulerson was in his majority, twenty-five years of age, at the time of the crime.
"AGGRAVATION
"(a) Whether the defendant was under sentence of imprisonment when the defendant committed the murder of which the defendant has been convicted.
"Finding:
Raulerson was not under sentence of imprisonment when he committed the murder of which he has been convicted.
"(b) Whether the defendant has previously been convicted of another capital felony or of a felony involving the use or threat of violence to the person.
"Finding:
There was no evidence of a previous conviction involving the use of threat of violence.
"(c) Whether, in committing the murder of which the defendant has been convicted, the defendant knowingly created a great risk of death to many persons.
"Finding:
Raulerson, by the use of a firearm, by his directions to the people in the Sailmaker restaurant, and by all of his aforementioned actions created a great risk of death to many persons.
"(d) Whether the murder was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery or rape.
"Finding:
The murder was committed immediately after Raulerson committed the crimes of robbery and rape and in an attempt to flee after committing the robbery and rape.
"(e) Whether the murder of which the defendant was convicted was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
"Finding:
The murder was committed by Raulerson in an attempt to escape from the Sailmaker restaurant and/or to avoid lawful arrest.
"(f) Whether the murder of which the defendant has just been convicted was committed for pecuniary gain.
"Finding:
The murder was committed during the commission of an armed robbery which Raulerson committed for pecuniary gain.
"(g) Whether the murder of which the defendant has just been convicted was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
"Finding:
The person killed by Raulerson was a police officer of the Jacksonville Sheriff's Office performing his lawful duty in the enforcement of the laws of the State of Florida, and the protection of the people of the State.
"(h) Whether the murder of which the defendant was convicted was especially heinous, atrocious or cruel.

*834 "Finding:
The murder of Officer Stewart, the wounding of Officer English, the robbery of the manager of the Sailmaker restaurant, and the rape of Linda Harrison were cold, calculated crimes which were atrocious, heinous, and cruel.
"It is the finding of this Court after weighing the aggravating and mitigating circumstances that there are sufficient aggravating circumstances which exist to justify the sentence of death."
It is our responsibility to review the judgment and sentence imposed upon defendant in the light of other decisions and determine whether or not the punishment is too great. The sentencing process must be a matter of reasoned judgment rather than an exercise in discretion.
Alford v. State, 307 So.2d 433 (Fla. 1975), was an affirmance of a death sentence where it appeared that the premeditated murder was committed by the defendant after committing rape. The Court found that the act was especially heinous, atrocious and cruel and the only mitigating circumstance was that defendant had no significant prior criminal record. Defendant in the present case says that the homicide was not heinous or cruel because it was accomplished by a pistol shot causing immediate death. This crime was committed during the course of the robbery and immediately after a rape. There were many shots fired and the deceased was well aware that his life was in danger from the moment he entered the restaurant. This was not a sudden attack, but was a part of a general robbery scheme. Alford had no significant prior criminal record. Raulerson had a significant history of prior criminal activity.
In Sawyer v. State, 313 So.2d 680 (Fla. 1975), the death penalty was justified by aggravating circumstance, which included the facts of an armed robbery resulting in murder, the defendant's prior record including the commission of multiple robberies. Sawyer was a hard drug user requiring the expenditure of $200 per day, and was a man with an uncontrollable violent temper. Just as in Sawyer, the defendant in the case sub judice had engaged in a series of robberies. Although it does not appear that Raulerson needed funds for the purchase of drugs or alcohol, it does appear that he was seeking pecuniary gain and that he committed a rape prior to the murder.
Songer v. State, 322 So.2d 481 (Fla. 1975), involved the murder of a state trooper. The defendant who was sentenced to death was 23 years of age, had prior felony convictions, and was not so intoxicated at the time of the crime as to be unaware as to what he was doing. The defendant murdered the state trooper by shooting him four times and attempted to flee. There were no mitigating circumstances and the death penalty was held to be appropriate. Raulerson's offense was committed during his effort to flee.
The defendant in Henry v. State, 328 So.2d 430 (Fla. 1976), had a lengthy history of violence and demonstrated callous indifference to human life when he assaulted a police officer at the time of his arrest. The Court found that his acts were committed for pecuniary gain and for no other motive than perhaps to eliminate a witness. The death penalty was properly imposed. Raulerson's acts were committed for pecuniary gain and for the purpose of avoiding arrest.
We are not confronted with the situation in which the "trigger man" was sentenced to life and the accomplice improperly received the death sentence, Slater v. State, 316 So.2d 539 (Fla. 1975), nor are we confronted with the situation where the jury gives an advisory verdict recommending mercy and the trial judge sentenced defendant to death. Swan v. State, 322 So.2d 485 (Fla. 1975); Tedder v. State, 322 So.2d 908 (Fla. 1975).
A murder committed during the course of a robbery, where the evidence shows defendant as being the trigger man, has been carefully considered by the Court in several cases. Meeks v. State, 339 So.2d 186 (Fla. 1976), involved an execution-type murder so that defendant could flee after the commission of the robbery. The death penalty was held appropriate even though defendant *835 was 21 and had no prior history of criminal conduct.
In Sullivan v. State, supra, the sentence of death was held appropriate where defendant and his accomplice abducted the manager of a restaurant, fully intending to murder the victim. The defendant was 25 years old, with no prior criminal record. The victim was shot several times in the back of the head.
In reviewing the aggravating and mitigating circumstances, the nature of the murder and the circumstances under which it was committed, we hold that the aggravating circumstances outweigh the mitigating circumstances and the penalty of death is the proper sentence.
We have reviewed the evidence and it does not appear that the ends of justice require that a new trial be awarded. We find that the judgment and sentence of the trial court in this cause is in accordance with the justice of the cause. Accordingly, the judgment and sentence of the circuit court is hereby affirmed.
It is so ordered.
OVERTON, C.J., and BOYD, ENGLAND, SUNDBERG and KARL, JJ., concur.